IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ATLANTIC MEDICAL SPECIALISTS, LLC, a Delaware Limited Liability Company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. N15C-06-245 CEB |
| GASTROENTEROLOGY ASSOCIATES, P.A., MICHELE CAMPONELLI, THOMAS SPAHR, MARK CORSO, M.D., DAVID R. BESWICK, M.D., IRA F. LOBIS, M.D. and JOSEPH F. HACKER III, M.D., | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Submitted: February 13, 2017
Decided: April 20, 2017

**MEMORANDUM OPINION**
*Upon Defendants' Motions for Summary Judgment.*
**GRANTED in Part and DENIED in Part.**

Laurence V. Cronin, Esquire, SMITH KATZENSTEIN & JENKINS LLP, Wilmington, Delaware. Attorney for Plaintiff.

Art C. Aranilla, Esquire, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, Wilmington, Delaware. Attorney for Defendant Michele Camponelli.

C. Scott Reese, Esquire and Christopher H. Lee, Esquire, COOCH AND TAYLOR P.A., Wilmington, Delaware. Attorneys for Defendants Gastroenterology Associates, P.A., Thomas Spahr, Mark Corso, M.D., David R. Beswick, M.D., Ira F. Lobis, M.D., and Joseph F. Hacker, III, M.D.

**BUTLER, J.**

## THE PARTIES

The Endoscopy Center of Delaware ("ECD") is an "ambulatory surgical center" ("ASC") operated near the Christiana Hospital primarily for the purpose of conducting endoscopic services.[1] It has been in operation for approximately 20 years.[2]

The ECD was founded by a medical practice of gastroenterologists that operates as a corporation called Gastroenterology Associates (GA).[3]

In 2001, a company based in Kentucky called Amsurg purchased a 51% stake in the ECD from GA.[4] Amsurg has a controlling interest in approximately 260 ASCs nationwide.[5] The remaining 49% interest in ECD was retained by the physicians of GA.[6]

Dr. Michael Katz ("Katz") is an anesthesiologist who formed an anesthesiology practice called Outpatient Anesthesia Services ("OAS") in 2002.[7]

---

[1] Pl. Ex. 17 at 1.

[2] Pl. Ex. 66 at 9.

[3] *Id.* at 9.

[4] *Id.* at 11.

[5] Pl. Ex. 2 at 16.

[6] *Id.* at 6-18; Pl. Ex. 66 at 11.

[7] Pl. Ex. 1 at 13.

1

OAS performed anesthesiology services for a number of medical practice groups, GA being one of them.[8]

We will also be hearing about Atlantic Medical Specialists ("AMS"). When Katz was preparing to leave OAS, he created AMS. At all times relevant to this case, Katz was the sole shareholder of AMS.[9]

The other major player in this dispute is Diamond Medical Management Services, LLC ("DMMS"). This group was founded by doctors at ECD and includes most of the GA doctors as members. The function of DMMS is to provide medical billing, insurance, payment and related "back office" services to medical practices – the primary one being GA.[10]

## FACTUAL BACKGROUND

## 2002 - 2011

Dr. Katz and 3 other anesthesiologists formed OAS.[11] Katz wrote the business plan.[12] The purpose of the business was to provide anesthesia services to

---

[8] *Id.* at 17-18.

[9] *Id.* at 29, 33-34.

[10] Pl. Ex. 67 at 20; Pl. Ex. 10; Pl. Ex. 68 at 13-16.

[11] Pl. Ex. 1 at 13.

[12] *Id.* at 15.

ASCs.[13] OAS was successful at obtaining business from several ASCs, including the ECD.[14]

OAS made fee reimbursement arrangements with various insurance companies with whom it had "participating" relationships[15] – these are called "par" in the industry.[16] These "par" arrangements set the rates at which the insurance payer will compensate the physician for his services. Services performed for insureds with which the physician is "non-par" are paid at the "usual and customary" rate as determined by the insurance company, less any copay, with the patient left to pay the physician any balance of the bill.[17]

The specific rate that a physician and insurance company work out in a "par" arrangement is considered confidential between the insurance company and the

---

[13] *Id.* at 14.

[14] *Id.* at 18.

[15] *Id.* at 53.

[16] Healthcare Information Guide, *Participating Provider Versus Non-Participating (Out-of-Network) Provider,* www.healthcare-information-guide.com/participating-nonparticipating.htm (last visited Feb. 27, 2017).

[17] *Id. See also* Joy Hicks, *Par vs. Non-Par Providers: The Differences Between Participating and Non-Participating Medical Providers,* Very Well (Nov. 20, 2016), www.verywell.com/par-vs-non-par-providers-2317177.

physician. Indeed, disclosure of a physician's reimbursement rate is fraught with legal peril.[18]

As outsiders might well imagine, medical practices are supported by accountants, bookkeepers, billing clerks, insurance liaisons, and various other "back office" assistance. GA created DMMS to support its own back office and, over time, offered its services to other medical practices.[19] The record indicates that today DMMS is the largest support service to emergency service providers state wide.[20]

When OAS obtained its contract to provide services at the ECD, it elected to contract with DMMS to provide back office support to OAS.[21] DMMS typically bills its clients a percentage of the practice's billings.[22] Indeed, DMMS billed GA – the very physicians that founded it – 10% of GA's monthly billings.[23]

---

[18] This issue is worthy of its own discussion, but exceeds the scope of this opinion. Terms like "price fixing" and "collusions in restraint of trade" are enough to intimidate any doctor tempted to share reimbursement rate information. In addition, "par" contracts with insurance companies typically contain their own confidentiality provisions. For a fuller discussion, *see generally* Cristina Olson, Note, *Desperate Doctors and Antitrust Laws*, 10 Nevada L.J. 811, 813-14 (2010). *See also* Frank T. Herdman, Comment, *Doctors, Insurers and the Antitrust Laws*, 37 Buff. L. Rev. 789 (1989).

[19] Pl. Ex. 69 at 19-20.

[20] Pl. Ex. 3 at 28.

[21] Pl. Ex. 1 at 24-25.

[22] *Id.* at 28.

[23] Pl. Ex. 3 at 162.

4

Through his work with OAS, Katz worked at the Endoscopy Center on a daily basis and he became friendly with the gastroenterologists working there, in particular with Dr. Joseph Hacker, the president of GA.[24]

**2011-2013**

In early 2012, Katz approached Dr. Hacker – who was a member of both GA and DMMS – and told him that he (Katz) believed that his partners at OAS were going to remove him as a partner with OAS.[25] Katz asked Hacker if Hacker and GA would consider keeping him at the ECD, where Katz had developed relationships with most of the staff.[26]

Hacker and Katz were personal friends and they discussed several different employment scenarios, including simply hiring Katz on to GA as a partner or employee.[27] Those conversations ultimately led to Hacker recommending – and ECD formally terminating – the OAS/ECD service agreement and signing a new agreement with AMS, which Katz had formed several months earlier.[28]

---

[24] Pl. Ex. 66 at 12, 24, 43, 50.

[25] Pl. Ex. 1 at 30-33.

[26] Pl. Ex. 66 at 14; Pl. Ex. 68 at 23-24.

[27] Katz Aff. ¶ 2.

[28] Pl. Ex. 1 at 29, 37-38; Pl. Ex. 70.

The AMS/ECD agreement worked in much the same way as the OAS/ECD agreement did. Katz/AMS would draw no income directly from ECD but would instead derive his/its income from insurance payers that insured clients of the ECD.[29]

As had OAS before him, Katz/AMS signed a separate agreement with DMMS, the billing company, to provide the billing and collection function for the arrangement between Katz/AMS and ECD.[30] It is to be noted here that while DMMS performed billing and collection services for OAS, the predecessor to AMS, as well as the doctors of GA, there is no evidence that either DMMS or GA forced AMS to use DMMS for its billing and collection services.[31] The AMS/DMMS agreement contained one provision that looms large in this litigation: a provision that bound DMMS to keep financial information about AMS confidential.[32]

The changeover from OAS to AMS was effective officially in May 2012.[33] AMS negotiated its own reimbursement "par" rates with some insurance

---

[29] Katz Aff. ¶ 3; Pl. Ex. 70 at ¶ 4.

[30] Pl. Ex. 4; Katz Aff. ¶ 5.

[31] Katz Aff. ¶ 5; Pl. Ex. 1 at 39-41.

[32] Pl. Ex. 4 at ¶ 7(c).

[33] Katz Aff. ¶ 7; Pl. Ex. 1 at 38.

6

companies and hired staff to do the anesthesia work. From the record, it appears that AMS was "par" with Medicare/Medicaid, Highmark Blue Cross/Blue Shield and Aetna.[34] Even months later at the end of 2012, AMS was still "non par" with all of the other insurers in the area.[35]

For a number of years, GA doctors had been seeking ways to consolidate services that were being subcontracted to other services.[36] For example, endoscopy and colonoscopy specimens must be analyzed. GA arranged to stop utilizing an outside lab to study the samples and brought the service in house.[37] Likewise, GA began delivering REMICADE, a drug frequently prescribed for their patients, in house.[38]

GA physicians had also learned of the growing trend in endoscopy to bring anesthesia in house and that this approach was being taken by endoscopy practices elsewhere.[39] Indeed, this was one of the options discussed when Katz was seeking employment in early 2012 when faced with the prospect of his ouster from OAS.[40]

---

[34] Pl. Ex. 1 at 52.

[35] Pl. Ex. 1 at 53; Pl. Ex. 3 at 45; Pl. Ex. 65 at 92.

[36] Pl. Ex. 3 at 38-39, 43, 52-56, 58-60; Pl. Ex. 66 at 29; Pl. Ex. 68 at 24.

[37] Pl. Ex. 3 at 40; Pl. Ex. 66 at 38-40.

[38] Pl. Ex. 68 at 51-53.

[39] Pl. Ex. 2 at 67-68; Pl. Ex. 3 at 53-54.

[40] Katz Aff. ¶ 6.

7

While Katz says by affidavit that this option was declined because GA was not convinced they could provide anesthesia services profitably,[41] GA doctors say the option was declined because they were still busy standing up the laboratory practice they had recently taken in house.[42]

In any event, in August 2012 – just months after AMS had replaced OAS as the anesthesia service provider, GA doctors Hacker and Corso attended a national conference where once again the subject of bringing anesthesia practices in house was discussed.[43] In addition, Amsurg, which owned any number of ASC centers, counseled the GA doctors that this was an approach a number of their other centers had taken.[44]

### THE NOVEMBER 2012 INQUIRIES OF DMMS

By November 2012, Katz/AMS had been operating at ECD for approximately 6 months. According to Plaintiff, even though the fledgling operation had to wait for insurance payments for services previously rendered to

---

[41] *Id.*

[42] Pl. Ex. 66 at 38.

[43] *Id.* at 39.

[44] Pl. Ex. 3 at 67.

come in, AMS was beginning to find its profitability.[45]  But the AMS/ECD relationship was not without its problems.

One issue that some doctors from GA have testified about arose when they heard complaints from their "non-par" patients about insurance payments and anesthesia services.[46]  The doctors testified that they were concerned enough that they inquired of their billing arm – DMMS – about how anesthesia services were being coded and submitted to insurance companies.[47]  This inquiry, about which Katz was never informed,[48] was quietly dismissed when they were satisfied by legal advice that Katz' billing practices were appropriate.[49]

There are several emails between the doctor directors of DMMS (who are also partners of GA) and DMMS staff making inquiry into how anesthesia is billed and responses from the staff enclosing copies of AMS' financial information. Whether these requests were benign or filled with tortuous intent is very much at the center of this dispute.  We can safely say, however, that questions were asked of DMMS and answers were given.

---

[45]  Katz Aff. ¶ 7; Am. Compl. ¶ 17.

[46]  Pl. Ex. 3 at 45; Pl. Ex. 67 at 49; Pl. Ex. 68 at 64.

[47]  Pl. Ex. 3 at 47; Pl. Ex. 68 at 47-48.

[48]  Katz Aff. ¶ 9.

[49]  Pl. Ex. 5.

Quite aside from these emailed inquiries of DMMS staff, the record demonstrates that the GA doctors also sought out consultants and lawyers to advise them on the feasibility of bringing anesthesia in house, including the preparation of *pro forma* projections of a consolidated operation.[50]

## January to July, 2013

By January 2013 – about 7 months after AMS began operating – GA decided it would bring anesthesia in house. Dr. Hacker broke the news to Katz, telling him that the agreement with AMS and ECD was going to come to an end but that Katz would be given a substantial employment contract with GA to continue delivering anesthesia services at the ECD.[51]

According to Katz' affidavit, he was "stunned" by the news, but took solace in Hacker's assurance that Katz would become a partner at GA[52] – an assurance that Hacker denies ever making.[53]

The record is quiet as to what happened between January and March of 2013, except for the arrival of Thomas Spahr as the new "practice manager" at GA.

---

[50] Pl. Ex. 3 at 56-57, 64, 81; Pl. Ex. 65 at 101; Pl. Ex. 66 at 40.

[51] Katz Aff. ¶ 8; Pl. Ex. 66 at 48, 50.

[52] Katz Aff. ¶ 8.

[53] Pl. Ex. 66 at 49.

According to Spahr, his first assignment at GA was to develop the planning to bring anesthesia – and Dr. Katz – in house.[54]

In April 2013, the ECD gave AMS "official" 90 day notice of the termination of the AMS/ECD agreement to be effective on August 1, 2013.[55]

### June 2013 – Katz Signs Employment Agreement with GA

On June 10, 2013, Katz signed an employment agreement with GA bringing him in house.[56] That contract gave Katz the title of "Medical Director" of the "Anesthesia Division" of GA at a salary of $425,000 with additional compensation that began at $50,000 and increased depending on other factors.[57] Although it was drafted to commence on July 1, a subsequent amendment made the effective date October 1, 2013.[58]

During this period, from the time Katz signed the employment agreement in June until it actually went into effect on October 1, 2013, there is other evidence supporting the proposition that employees of DMMS, GA and Katz all shared

---

[54] Pl. Ex. 69 at 21.

[55] Pl. Ex. 2 at 47.

[56] Pl. Ex. 45.

[57] *Id.*

[58] *Id.*

11

information concerning anesthesia insurance contacts and reimbursement rates for anesthesia services.

Plaintiff directs us to one insurance contract with which AMS was "par" as demonstrative of GA's improper use of AMS' information. The record shows that Thomas Spahr was the GA employee most concerned with arranging the "par" agreements with the various insurance companies. In his emailed correspondence with Aetna in July 2013, Spahr was unclear whether the rate being offered by Aetna was consistent with the rate Aetna had been paying AMS.[59] Spahr made inquiry of both Katz and DMMS whether Aetna's offer was a good one.[60] Although an email response from Katz is in the record,[61] Katz swears that he told Spahr it was inappropriate to even ask the question.[62] Whether Spahr sought a specific rate from Aetna or simply the same rate that Aetna was giving AMS is one of those fact issues that is hotly contested but is not "material" to the Court's ruling here. Whatever happened, Katz points to this event as direct evidence of GA exploiting AMS' "trade secret" information for its own benefit.

Apparently Katz as employee was not nearly as comfortable as Katz as contract worker for OAS or AMS. The one year employment contract between

[59] Pl. Ex. 30-35.

[60] Pl. Ex. 35; Pl. Ex. 69 at 27-28.

[61] Pl. Ex. 28.

[62] Katz Aff. ¶ 10.

12

Katz and ECD that began on October 1, 2013, was terminated by ECD on October 1, 2014, effective January 31, 2015.

## I. PROCEDURAL HISTORY

AMS filed this lawsuit on June 23, 2015 – about 6 months after Katz was let go under his contract with the ECD. He filed against GA, the "CEO" of DMMS Michele Camponelli, and the "practice manager" of GA, Thomas Spahr.

It is noteworthy who is *not* in this lawsuit – DMMS. Plaintiff's counsel candidly advised the Court that the written contract between AMS/Katz and DMMS includes an arbitration clause. Plaintiff says Ms. Camponelli is not subject to the arbitration provision of the DMMS contract because she is sued here in her "individual capacity." Thomas Spahr, also named individually as a defendant, began his employment with GA in March 2013 and thus was not so employed at the time at least some of this history was being developed. Again, Plaintiff avers Spahr is also sued in his "individual capacity."

The Complaint is brought in two counts. The claim in Count I is that the Defendants misappropriated "trade secrets" consisting of "confidential business information" that included "financial information about its operations that demonstrated its profitability." Count II is denominated "tortious interference with contractual relationships." Specifically, Plaintiff claims that the named defendants, knowing that DMMS was precluded by contract from sharing AMS' business

13

information, nonetheless induced DMMS to share its information with GA. According to Plaintiff, that sharing of tortuously obtained information caused GA to induce ECD to terminate its contract with AMS.

The complaint was duly answered and discovery commenced. Noteworthy for these purposes is a motion to compel filed by defendant GA as to certain interrogatory answers filed by Plaintiff.

Defendants sought information from Plaintiff fleshing out its claim to a misappropriation of "trade secrets" as well as Katz' personal tax returns in support of the claim for damages. Before those issues came up for argument, the Defendants withdrew their claim for Katz' personal financial information when Plaintiff assured Defendants that Katz was not seeking any damages whatsoever, that Plaintiff AMS was the only damaged party seeking recovery. Defendants apparently accepted that argument but pressed the "trade secrets" question.

In response to this latter issue, Plaintiff urged that its trade secrets included: 1) the income it received, 2) the rates it negotiated with payers/insurance companies, 3) the money it actually received from payers and 4) its profit margin. Because discovery was ongoing at that point, the Court was unwilling to foreclose Plaintiff from making whatever case it could that its "trade secrets" had been misappropriated. But the Court made it clear that the issue whether Plaintiff's case

14

was indeed over a "trade secret" was by no means certain and would be further plumbed after discovery was completed.

In September 2016, Plaintiff filed its amended its complaint adding individual defendants Drs. Corso, Beswick, Lobis and Hacker. According to the amended complaint, each of the newly named individual defendants are/were owners of both GA and DMMA. The only "new" allegation predicating this claim of individual liability is this: "Defendants Camponelli, Spahr, Beswick, Corso, Lobis and Hacker were personally involved in causing the confidential business information of AMS to be shared with GA without the consent of AMS."

After additional discovery, the Court has been presented with: 1) a motion for judgment on the pleadings as to the newly named defendants Corso, Beswick, Lobis and Hacker,[63] 2) an expansive motion for summary judgment filed by the GA defendants, and 3) a separate motion for summary judgment filed by Defendant Camponelli. Permission to file expanded briefs was requested and granted. Each of these motions have been duly answered by the Plaintiff and reply briefs have been filed. In addition, the Court had the benefit of extended oral argument on the motions on February 13, 2017.

---

[63] This motion for judgment on the pleadings will be addressed by a separate opinion being issued today.

What follows is the Court's ruling on the motion for summary judgment of the GA defendants and the separate motion of defendant Michele Camponelli.

## II. STANDARD OF REVIEW

Pursuant to Superior Court Rule 56, summary judgment "shall be rendered forthwith if... there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law."

Plaintiff bears the burden of proving the existence and misappropriation of a trade secret.[64] When a motion for summary judgment is supported by a showing that there are no material issues of fact, the burden shifts to a non-moving party to demonstrate that there exist genuine issues of material fact.[65] If Plaintiff fails to meet this burden, this Court's inquiry ends and judgment must be entered for defendants.[66] "Specifically, under DUTSA, the plaintiff affirmatively must prove the following: first, that a trade secret exists, i.e., that the statutory elements—commercial utility or value arising from secrecy and reasonable steps to maintain secrecy—have been shown; second, that the plaintiff communicated the trade secret; third, that such communication was made pursuant to an express or implied understanding that the secrecy of the matter would be respected; and fourth, that

---

[64] *Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *18 (Del. Ch. Mar. 5, 2014).

[65] *Moore v. Sizemore*, 405 A.2d 679 (Del. 1979).

[66] *Miles Inc. v. Cookson America, Inc.*, 1994 WL 676761 (Del. Ch. Nov. 15, 1994).

the trade secret has been used or disclosed improperly to the plaintiff's detriment."[67]

### III. ANALYSIS

### A. BRIEF HISTORY OF DUTSA

Count 1 of the Amended Complaint seeks damages for misappropriation of a "trade secret" and so the first question deserving our attention is whether the information in dispute here is one.

In the first half of the 20th century, the business community was concerned that business competition could be hampered by exposing innovation and capital to harmful lawsuits. At the same time, some businesses were being victimized by predatory competitors that engaged in unfair practices, including hiring away key personnel who brought the former employer's confidential business information with them. While our early history surely favored competition and open markets over complaints of sharp practices, the law needed to evolve to repudiate a class of competitive behavior that crossed the line.

We will begin our review of the developing law of trade secrets with the First Restatement of Torts. Like other Restatements, it represented a broad overview of the state of the law as practiced in state courts across the country at the time of its publication (1939). Section § 757 of the Restatement directed the

---

[67] *Wayman,* 2014 WL 897223 at *13 (Del. Ch. Mar. 5, 2014).

17

practitioner to factors that might trigger liability if one disclosed or used the trade secret of another. But rather than defining a trade secret specifically, the Restatement settled for a discussion of what one might be, in comment (b):

> It differs from other secret information in a business (see § 759) in that it is not simply information as to single or ephemeral events in the conduct of the business... A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.[68]

This somewhat amorphous "definition" was distinguished from a different class of misappropriation of business information. Restatement section 759 recognized liability for "Procuring Information by Improper Means," which involved, as its name implies, procurement of "information about another's business" by improper means for the "purpose of advancing a rival business interest."[69] This was, in essence, a category of confidential business information that was not a trade secret. As we shall see, its absence in the codified law, or in any subsequent Restatement, is sorely missed.

---

[68] Restatement (First) of Torts § 757.

[69] *Id.* § 759.

Aside from the difficulties in defining exactly what a trade secret is, federal law was evolving as well. States were consolidating their courts of law and equity, broadening the scope of available remedies. In addition, the Supreme Court's *Erie*[70] decision that "there is no federal common law" with its direction to federal courts in diversity cases to follow the common law of the forum states left many in the bar concerned with how a common law of "business torts" would develop.

Meanwhile, states were beginning to pass their own trade secrets protection and deceptive trade practice laws,[71] but there was no effort to coordinate the statutes across state lines, leaving business and employees with differing and potentially conflicting duties and remedies among the states.

In 1964, the Supreme Court issued its "*Sears/Compco*" decisions[72] invalidating Illinois' unfair competition laws because they conflicted with federal patent law. So to the extent businesses were hoping for a "federal common law" of unfair trade practices, their hopes were dashed by *Erie*. To the extent they were hoping for a developing state law barring unfair competitive practices, their hopes

---

[70] *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[71] *See generally* Jack E. Karns, *State Regulation of Deceptive Trade Practices Under "Little FTC Acts": Should Federal Standards Control?*, 94 Dick. L. Rev. 373, 373 (1990); Sharon K. Sandeen, *The Evolution of Trade Secret Law and Why Courts Commit Error When They Do Not Follow the Uniform Trade Secrets Act*, 33 Hamline L. Rev. 493, 507 (2010).

[72] *Sears Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964); *Compco Corp v. Day-Bright Lighting, Inc.*, 376 U.S. 234 (1964).

were dashed by *Sears/Compco*. It has been called the *"Erie/Sears/Compco* Squeeze": "the very entities that were charged with developing unfair competition law – state courts and legislatures – were prevented by principles of federal preemption from adopting state laws that interfered with federal patent policies."[73]

Whether it was the "squeeze" of Supreme Court jurisprudence, the press of other business, or simply difficult work by the American Bar Association's Patent, Trademark and Copyright Committee, the effort to produce a uniform trade secrets law that began in 1968 did not yield a Uniform Trade Secrets Act ("UTSA") until 1979.[74] While we must discuss its details presently, two overall features are worth mentioning at the outset.

First, UTSA regulates the misappropriation of "trade secrets" and makes a strong effort to define what a trade secret is. Unlike the Restatement of Torts (First), there is no provision for business information that is confidential but does not meet the definition of a "trade secret."[75] Second, in order to promote the desired uniformity and predictability across the states, UTSA contains an important

---

[73] Sandeen, *supra* note 71, at 507.

[74] The Uniform Trade Secrets Act has now been passed in 47 states. *See* Uniform Law Commission, www.uniformlaws.org (Last visited March 10, 2017). Delaware passed its version in 1982. 63 *Del. Laws,* c. 218. Because Delaware's version is *in pari materia* with the provisions promulgated in the UTSA, at least as to this dispute, they may be referenced interchangeably as "UTSA" or "DUTSA."

[75] *See* Restatement (First) of Torts § 759.

"displacement" provision that requires that all claims falling within its somewhat amorphous terms be preempted in favor of disposition under the Act.[76]

But lest we get ahead of ourselves, an examination of the term "trade secret" is clearly our first order of business.

## B. IS THE SUBJECT MATTER OF THE LAWSUIT A TRADE SECRET?

Under DUTSA, a "trade secret" is defined as follows:

> "Trade secret" shall mean information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[77]

### 1. Was The Information "Known or Readily Ascertainable by Proper Means?"

In this dispute, Plaintiff claims misappropriation of its "trade secrets" with respect to two categories of information: 1) its profitability, and 2) its reimbursement rates from insurance companies.[78]

---

[76] 6 *Del. C.* § 2007.

[77] 6 *Del. C.* § 2001.

[78] We recognize that this is a somewhat truncated version of Plaintiff's alleged trade secrets, *see supra* pp. 13-15. But Plaintiff's complaints as to the income it received, the money it actually received from payers and its profit margin are but different versions of the same issue: its profitability.

21

a. *Was information concerning AMS' profitability known or readily ascertainable?*

Plaintiff claims that Defendants obtained information concerning its profitability by ordering employees of DMMS, a company controlled by Defendants, to deliver it up. For purposes of this motion, we must assume this to be true. But while that may describe how Defendants learned the information, it begs the question whether the information they learned was also "known or readily ascertainable through other means."

The movement of anesthesia services "in house" at ASCs generally is not news, or secret.[79] There is testimony in this record that GA doctors had been considering bringing anesthesia services in house for some time before November 2012.[80] There is further testimony that in considering the question, they consulted practice specialists, attorneys and accountants who created *pro forma* financial information to project revenue and profit from an in house anesthesia practice.[81] There is no evidence that any of this data was generated by using revenue or expense data from the books of AMS.

---

[79] *See, e.g.,* Pl. Ex. 67 at 54 ("there's articles in the New York Times, JAMA, Journal of the American Medical Association, regarding anesthesia costs for GI endoscopy").

[80] *E.g.,* Pl. Ex. 2 at 67-68; Pl. Ex. 3 at 53-54.

[81] Pl. Ex. 3 at 56-57, 64, 81; Pl. Ex. 65 at 101; Pl. Ex. 66 at 40.

Plaintiff urges that while bringing the service in house may have been a topic of general conversation, Defendants had hitherto not done so because they were not impressed that doing so would be profitable.[82] Whether that is a correct history or not, it again begs the question: was the idea that ambulatory surgery centers bringing anesthesia services in house was profitable for the owners of the ASC information that was self-evident or at least readily ascertainable? Even if we accept the proposition that "cutting out the middleman" and employing an anesthesiologist in house would be profitable was not "self evident," the Court cannot agree that figuring this out was not a conclusion "readily ascertainable" upon even the most basic analysis.

For example, information is not "misappropriated" when it is "readily ascertainable" by "reverse engineering."[83] Here, there is record testimony that Dr. Beswick did exactly that. Knowing that the ECD serviced approximately 10,000 patients per year and, using the "explanation of benefits" from his own procedure that included both the fee charged by the anesthesiology service and what the insurance company paid, he was able to determine a gross revenue number for the

---

[82] Katz Aff. ¶ 6.

[83] Uniform Trade Secrets Act, § 1, Comments (1979)("Proper means include: (1) discovery by independent invention; (2) *discovery by reverse engineering*; (3) discovery pursuant to a license from the owner of the trade secret; (4) observation of the item in public use or on public display; and (5) obtaining the alleged trade secret from the published literature")(*emphasis added*).

practice annually.[84]   If a doctor can figure out the numbers from his own colonoscopy on the back of a napkin, it cannot rightly be considered a trade secret.

> b. *Was the reimbursement rate from insurance companies known or readily ascertainable?*

The information concerning reimbursement rates stands on substantially different footing from the issue of profitability generally.   We understand that individual physicians and practices must negotiate their reimbursement rates with insurance company payers separately from others.[85]

On the other hand, the federal government maintains an open website through which anyone can learn the reimbursement rates for procedures covered by Medicare.[86]   We also understand that doctors seeking a "par" relationship with an insurer may use the published Medicare reimbursement rate as one measure of the value of the service.[87]

All of this helps us understand that while an outsider could obtain some idea of a reimbursement rate by consulting readily available and "trade" sources, the

---

[84] Pl. Ex. 67 at 61-63, 102-04; Pl. Ex. 50.

[85] *See* Olson, *supra* note 18, at 813-14.  *See also* Herdman, *supra* note 18, at 790.

[86] Centers for Medicare & Medicaid Services, *Physician Fee Schedule,*
https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/index.html (Last visited March 20, 2017).

[87] *See* Pl. Ex. 69 at 30, 66.

outsider could not learn the specific reimbursement rate between a specific insurer and a specific doctor.

## 2. Did the Information Have Independent Economic Value Because it was Secret?

### a. *Profitability*

The second requirement for a trade secret under the Code is that the information concerning AMS' profitability and reimbursement rates have "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."[88]

We can think of this requirement as one that the "secret" – for example in this case, the profitability of the anesthesia business at the ECD – have *independent* economic value *because* it is a secret. It strikes us that profitability in a publicly traded company is not only not a secret, its profitability must be made known in public filings available for all the world to see.

Let us assume that an entrepreneur, say, a doctor starting an anesthesia business, comes up with an idea to create an enterprise from which he derives great profit. Does the fact that he keeps the profitability a secret give the profitability "independent economic value?" The Court must answer this question in the negative. A business is either profitable or it is not. The Trade Secrets Act seeks

---

[88] 6 *Del. C.* § 2001 (4)a.

to protect those ideas, information, processes, etc. that gives the enterprise profitability, not the fact that it is profitable. The fact that the enterprise is profitable has no independent economic value. We have been directed to no case that found profit or loss, standing alone, to qualify as a "trade secret."

Even in Plaintiff's most sinister view of the meddling into its profitability, Plaintiff points to no evidence that GA used any *specific* information about profitability in its deliberations. After all, AMS had only been in business a few months and GA's cost structure would have been substantially different. About the most damaging thing Plaintiff can say is that GA looked at AMS' numbers, saw that it was profitable, and decided to move forward bringing anesthesia in house. This accusation lacks all of the typical hallmarks of a trade secret, i.e., new marketing plans, chemical formulas, client lists, and other materials developed by a business only after the extension of considerable effort. The trade secret law seeks to protect that investment in the business, the ideas, the effort and time spent by the business in developing it.

If the profitability of AMS were coupled with other elements belonging to AMS depicting new business plans, *pro formas*, etc., Plaintiff might have a stronger argument. Under the facts in this record, the Court is not satisfied that mere profitability, standing alone, has "independent economic value" because it is kept a secret.

## b. *Reimbursement rate*

Plaintiff returns us to its argument that GA attempted to leverage AMS' reimbursement rate with Aetna in its negotiations with Aetna over GA's reimbursement rate with the future in house anesthesia practice. The difficulty with this position is that assuming it happened just that way, Plaintiff does not advance his argument that the rate had independent economic value because it was a secret.

Despite the legal peril of attempting to leverage one doctor's reimbursement rate in order to obtain that rate for oneself, Plaintiff has at least attempted to argue that Defendants did just that. But the record testimony is not quite there. Defendant Spahr testified that in negotiating with Aetna, he asked Aetna to reimburse GA at the same rate they had reimbursed AMS – without identifying a specific rate.[89]

We can readily suppose that Plaintiff would argue that seeking AMS' rate must presuppose knowing AMS' rate, otherwise why ask for it, and therefore GA was in fact leveraging AMS' rate, albeit not in so many words. The Court, however, sees a fundamental difference in the two approaches. Asking for the same rate your predecessor had only "leverages" that rate in the abstract, like the

---

[89] Pl. Ex. 69 at 64; Pl. Ex. 32 (email chain in which Spahr asks Aetna to give GA the same rates it extended to AMS); Pl. Ex. 35 (Aetna agreeing to pay "the current rates from" AMS).

idea of "profitability." It is AMS' specific reimbursement rate that even arguably qualifies for trade secret protection, not the fact that it got some rate generally.

Finally, and by no means essential to our holding, it is difficult to sustain the position that one party to a bilateral contract (AMS) winds up with a "trade secret" (the reimbursement rate) when the other party (the insurance company) is fully aware of the reimbursement rate and has no constraint on broadcasting it to the world if it chose to do so.[90]

The Court raised this question with counsel during oral argument. We were directed to *Edix Media Group, Inc. v. Mahani*,[91] for the proposition that even a bilateral contract could contain trade secrets. This case is instructive and worth considering.

*Edix* involved malicious conduct by a disgruntled former employee of an automotive magazine who, *inter alia,* revealed to all of a magazine's advertisers the rates that all of the other advertisers actually paid the magazine (as opposed to the "rate card" the magazine quoted to potential advertisers). The Chancery Court held that the employee had misappropriated "trade secrets" and assessed damages.

---

[90] *See generally Conn. Podiatric Medical Ass'n v. Health Net of Conn., Inc.*, 2006 WL 437548 at *2 (Conn. Super. Feb. 1, 2006)(in refusing to grant trade secret status to reimbursement rates, court notes they are bilateral contracts between providers and insurance companies).

[91] 2006 WL 3742595 (Del. Ch. Dec. 12, 2006).

28

There are important distinctions here. The "secret" with independent economic value in *Edix* was the magazine's deviations from its published rate, which "helps them to enforce the rate card with respect to other firms."[92] That secret belonged to Edix. It was the product of Edix's efforts. The discounted rate paid by the discounted advertiser had no "independent economic value" to the discounted advertiser, whose rate was whatever discount it was able to negotiate individually. So while the magazine, as the holder of the trade secret, had rights against its former employee, the case says nothing whatever as to the advertiser's right to claim trade secret protection for the secret rate negotiated between the magazine and the advertiser. The rate the advertiser paid was simply the result of a negotiation with the magazine, it had no independent economic value to the advertiser derived by reason of any secrecy.

Plaintiff here is the advertiser, not the magazine in the *Edix* example. The insurance company may have a protectable trade secret interest in the reimbursement rates it pays physicians, but it does not follow that the physician likewise has one. While *Edix* may suggest that the rate in a bilateral contract may be accorded trade secret protection, we think that is too broad a reading: trade secret protection belongs to the party that meets all of the criteria of the trade secret

---

[92] *Id.* at *6.

definition; there is no "derivative" trade secret protection. Plaintiff's reliance on *Edix* is not well taken.

This discussion demonstrates that Plaintiff's claim to trade secret protection for business profitability and specific reimbursement rates from insurance companies fail an important test.

### 3. Did Plaintiff Undertake Reasonable Efforts to Keep His Information Secret?

The third area of inquiry in a "trade secret" claim is whether the holder of the secrets undertook "efforts that are reasonable under the circumstances to maintain its secrecy."[93]

In order to meet its burden with respect to this element, Plaintiff points to the AMS/DMMS contract that contains a "Confidentiality of Records" provision.[94] The provision calls upon DMMS to hold the financial records developed as part of its billing service for AMS in confidence and for the benefit of AMS. It calls upon DMMS to undertake "reasonable commercial safeguards" to preserve the financial information it gathers concerning AMS.[95]

But the DMMS confidentiality provision is the singular piece of evidence of "reasonable effort" to which Plaintiff points. Arrayed against it is any number of

---

[93] 6 *Del C.* § 2001(4)b.

[94] Pl. Ex. 4 ¶ 7(c).

[95] *Id.*

30

efforts NOT undertaken and indeed, quite a few that can only be called risky and dangerous.

For example, Plaintiff affirmatively alleges that Katz was acutely aware that GA was considering bringing anesthesia services in house in early 2012 when AMS was created by Katz to perform contract services for GA.[96] And Plaintiff concedes that Katz was fully aware that DMMS was controlled by officers of GA – the very group that considered hiring Katz directly.[97] As noted previously, AMS could easily have selected a different bookkeeping service in order to avoid any possibility of GA inspecting its revenue. Instead, it signed up with an organization that was privileged to inspect its books, and now seeks confirmation that the decision was commercially reasonable.

The AMS/DMMS contract called upon AMS to pay 12.2% of its revenues as service fee for DMMS' bookkeeping function.[98] Plaintiff knew that DMMS would be keeping track of its revenues and profits, and also knew that the management of DMMS was entitled to review its revenues to ensure that DMMS was getting its proper fees. So not only did Plaintiff hire a bookkeeping company that was in a conflicted position – a position he now faults defendants for – Plaintiff also knew

---

[96] Katz Aff. ¶ 6.

[97] Katz Aff. ¶ 5; Pl. Ex. 1 at 44-45.

[98] Pl. Ex. 4 ¶ 5(a).

when it signed the agreement that DMMS would be looking at the very information Plaintiff now wants to call a trade secret.

Katz knew that DMMS employees were moving in and out of the organization. He had an office in the DMMS offices.[99] He did nothing to remind new DMMS employees of the confidentiality provision. Katz issued no memos, emails or reminders. No defendant deposed in this case could even testify to any specific recollection of the confidentiality provision.[100] If the DMMS/AMS contract was signed and stuffed into a drawer somewhere, it would not have drawn any less attention.

All of this gives Katz reason enough to complain about DMMS. But Plaintiff's burden here is not to show a breach of contract by DMMS – a claim not before the Court – but rather to show that Plaintiff undertook commercially reasonable efforts to protect secrecy. In the Court's view, it is simply insufficient to say "it wasn't my job, I asked DMMS to do it."[101]

Finally, it was in July 2013 that more detailed information concerning AMS' reimbursements with "par" insurance companies was shared with GA

---

[99] Pl. Ex. 1 at 60.

[100] *See* Pl. Ex. 3 at 85-88; Pl. Ex. 66 at 52-53; Pl. Ex. 67 at 43-45; Pl. Ex. 68 at 39-40

[101] *See generally Wayman,* 2014 WL at *15 (finding insufficient efforts where former employer merely password protected a contact list; employer's reference to employee handbook was to no avail where no evidence employee ever read it).

32

management. In the Court's view, Katz' employment agreement, signed in June 2013 and his cooperation with GA in its efforts to get "par" agreements with insurance companies demonstrated his abandonment of AMS in favor of the employment agreement with GA. If he said nothing in November 2012 when DMMS directors inquired about AMS' revenues, perhaps he can be forgiven because he did not know it happened. But in July 2013, after he had signed a lucrative employment contract with GA, he was quite aware that GA staff was inquiring about AMS' revenue figures.[102] He continued to remain quiet. Katz clearly had stopped undertaking any reasonable efforts to maintain the secrecy of financial data of AMS within the meaning of the trade secrets law.

Because the Court finds that Plaintiff's claims of trade secret protection fall short of the mandatory definitions on multiple fronts, the Court cannot permit Count I to proceed to a jury as the Court finds that Plaintiff's claims are not over trade secrets. Count I must fail as a matter of law.

## IV. PREEMPTION UNDER DUTSA

The second count of Plaintiff's complaint alleges tortuous interference with contract. The substance of the allegation is that because GA "tortuously interfered" with the AMS/DMMS contract (by inducing DMMS employees to divulge confidential business information), that caused the ECD to terminate

---

[102] *See* Pl. Ex. 65 at 77, 78, 81; Pl. Ex. 69 at 27-28, 41-43, 55-56.

33

(lawfully) its contract with AMS. Before Count II can proceed to trial, we must consider the effect of section 7 of DUTSA.

## A. DUTSA DISPLACEMENT

Section 7 of UTSA, found in our Code at 6 *Del. C.* 2007, provides that:

(a) Except as provided in subsection (b) of this section, this chapter displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret.

(b) This chapter does not affect:
(1) Contractual remedies, whether or not based upon misappropriation of a trade secret;
(2) Other civil remedies that are not based upon misappropriation of a trade secret; or
(3) Criminal remedies, whether or not based upon misappropriation of a trade secret.[103]

This "displacement" provision is remarkable in many respects and has generated more than a little controversy in states that have adopted it.[104] Our holding that Plaintiff's claim is not a "trade secret" puts this dispute in the center of the debate.

We pause momentarily to recall that Restatement (First) of Torts did protect non-trade secret information and the drafters of UTSA were well aware that UTSA fails to do so. The issue appeared many times in the 10 years UTSA was under

---

[103] 6 *Del. C.* § 2007.

[104] *See, e.g.,* Warrington S. Parker, III & Daniel D. Justice, *The Differing Approaches to Preemption under the Uniform Trade Secrets Act,* 49 Tort Trial & Ins. Prac. L.J. 645 (2014).

consideration by the NCCUSL, "like a bad penny."[105]  And yet, the final draft simply left non-trade secret confidential information out of the statute.  Neither DUTSA nor UTSA make an effort to protect non-trade secret confidential business information.  While some believe this to be a failing of the trade secrets law,[106] it is difficult to argue that the drafters simply forgot about it.  A more compelling argument can be made that the drafters concluded that non-trade secret confidential business information should not receive legal protection.

The debate over the scope of the displacement/preemption provision of section 7 has given rise to differing "forms of analysis" and a split among the courts as to its meaning.[107]

The so called "minority view" holds that suits concerning confidential business information that are found not to be trade secrets are free to proceed on whatever state tort law claim the plaintiff can make out.  The argument goes that the Code only "displaces…civil remedies for misappropriation of a trade secret" and, since the Court has ruled that the information was not a trade secret, the

---

[105] Sandeen, *supra* note 71, at 528.

[106] Indeed, some have argued that the "fundamental ambiguity" of section 7 can only be remedied by amendment to the statute.  *See generally* John T. Cross, *UTSA Displacement of Other State Law Claims*, 33 Hamline L. Rev. 445, 481 (2010).

[107] *See also* Parker, Justice, *supra* note 104, at 648.

UTSA displaces nothing.[108]   Indeed, Plaintiff in this case argues that since "tortuous interference with contract" contains a different "element" from misappropriation of trade secrets, it is not simply a rephrased trade secrets claim.[109]

Critics of the minority view point out that "[u]nder this logic, the UTSA is more or less superfluous, because the plaintiff can still pursue a state law intellectual property tort claim over the same information regardless of whether the information is a trade secret."[110]  Clearly the displacement/preemption provision in section 7 of UTSA was put there for a reason.  Our duty is to give effect to the laws as passed by our legislature.

The "majority view" of section 7 displacement holds that non-trade secret information is not a protectable class of information and therefore common law claims that seek to protect it are preempted.[111]  Under this line of reasoning, any claim of misappropriation of business information must be preempted by UTSA,

---

[108] *E.g., Burbank Grease Services, LLC v. Sokolowski*, 717 N.W. 2d 781 (Wisc. 2006); *Custom Teleconnect v. Int'l Tele-Services*, 254 F.Supp. 2d 1173 (D. Nev. 2003); *Powell Prods, Inc. v. Mawrks*, 948 F.Supp. 1468, 1474 (D. Colo. 1996).

[109] The so called "elements test" is indeed employed by some courts.  *See* discussion and citiations in *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*, 235 P.2d 310, 320-21 (2010).

[110] *See* Charles Tait Graves, Elizabeth Tippett, *UTSA Preemption and the Public Domain: How Courts Have Overlooked Patent Preemption of State Law Claims Alleging Employee Wrongdoing*, 65 Rutgers L. Rev. 59, 83 (2012).

[111] *See* Richard F. Dole, Jr., *Preemption of Other State Law by the Uniform Trade Secrets Act*, 17 SMU Sci & Tech. L. Rev. 95 (2014)(describing the "majority view"); *See also Hauck Mfg. v. Astec Indus.*, 375 F. Supp. 2d 649, 656 (E.D. Tenn. 2004); *Bliss Cleaning Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 948 (W.D. Mich. 2003).

otherwise the purposes of UTSA (to create uniformity, predictability and clarity among the states) would be subverted.[112] It must be conceded that the majority view may produce results that appear harsh, but as we will discuss, the effects may be softened considerably by careful management of the information.

## B. DELAWARE DECISIONS ON DISPLACEMENT

The Delaware Supreme Court has spoken on the subject. *Savor, Inc. v. FMR Corp.* was a case brought by an "idea submitter" who pitched a concept to a manager at Fidelity Investment Corp. to create interest in a program where consumers would spin off rebates through which they could fund their State Qualified Tuition Plans.[113] When Savor learned that a manager at Fidelity had left the company and founded UPromise, a company that offered a product identical to the one Savor had pitched to Fidelity, and that Fidelity would manage the program, Savor sued both UPromise and Fidelity. The claims were 1) misappropriation of a trade secret, 2) civil conspiracy, and 3) unfair competition.

On a motion to dismiss the complaint, the trial court held that Savor's business idea did not meet the statutory definition of "trade secret" and therefore the trade secret claim was dismissed. It further held that the unfair competition and

---

[112] *See Firetrace USA, LLC v. Jesclard*, 800 F.Supp. 2d 1042, 1048 (D. Ariz. 2010) *citing Mortg. Specialists, Inc. v. Davey*, 904 A.2d 652, 683 (N.H. 2006). *See also* Parker, Justice, *supra* note 104, at 648.

[113] 812 A.2d 894 (Del. 2002).

civil conspiracy claims must be dismissed due to the displacement provision of section 7 of UTSA.[114]

When the *Savor* case went to the Delaware Supreme Court, the Court reversed the trial judge's dismissal because it found that "the Complaint adequately states a misappropriation of trade secrets claim."[115] But as to Savor's argument that its common law tort claims should be revived because they had been dismissed so early in the litigation,[116] the Supreme Court, relying on Section 7 of DUTSA, said, "Savor's common law claims seek civil remedies based solely on the alleged misappropriation of a trade secret. Thus, the Superior Court correctly ruled that Savor's common law claims are precluded."[117]

Plaintiff in this case asks us to ignore *Savor*, urging, in essence, that the Supreme Court has done so. This argument is predicated on the Supreme Court's

---

[114] 6 *Del. C.* § 2007. The trial court cited the U.S. District Court's opinion in *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.,* 755 F.Supp. 635 (D. Del. 1991), in support of its dismissal of the collateral tort claims. In *Leucadia*, the District Court precluded common law unfair competition claims that were "based on the same factual allegations" that supported the misappropriation of trade secrets claim.

[115] *Savor*, 812 A.2d at 897.

[116] For a discussion of whether preemption issues can be decided on a motion to dismiss or should await summary judgment, *see* Parker, Justice, *supra* note 104.

[117] *Savor*, 812 A.2d at 898.

treatment of the issue in *ASDI, Inc. v. Beard Research, Inc.*[118] The Court believes Plaintiff's argument is overstated.

*ASDI, Inc. v. Beard Research, Inc.* rested on a Chancery Court case that went to trial.[119] In its post-trial opinion, the Court of Chancery dealt with a host of issues. One part of that opinion decided that the plaintiff's breach of fiduciary duties claim was not preempted by a DUTSA claim because a breach of fiduciary case may be made out even if the business information is not a trade secret.[120] That decision was affirmed on appeal, but without discussion of the Chancery Court's holding with respect to section 7's preemption provision. [121]

## C. HARMONIZING DELAWARE'S RESPONSE TO DISPLACEMENT

The Court is not convinced that *ASDI Research* overruled *Savor*. If we look at the two cases from the perspective of the duties owed by the defendants, the defendant in *ASDI* was a fiduciary. In *Savor*, it was a mere business contact. Moreover, the nature of the claims was different. *Savor*'s claims were common law unfair competition and civil conspiracy, based upon the same allegations as the

---

[118] 11 A.3d 749 (Del. 2010).

[119] 8 A.3d 573 (Del. Ch. 2010)

[120] *Id.* at 602.

[121] The Supreme Court's holding is impactful here only in that it held that a tortuous interference claim may be made out even where a contract is lawfully terminated, a claim made here. *See infra* note 122.

trade secrets claim. *ASDI* was a fiduciary claim that could be pressed regardless whether the information was a trade secret or merely confidential business information.[122]

The Court concludes that Delaware has joined the "majority view" that section 7 of DUTSA precludes common law claims based on misappropriation of business information even in cases in which the claim does not meet the statutory definition of "trade secret" under the Code. This was the specific holding of *Savor* and it has not been overruled. We must conclude also that where the duties owed do not arise from the fact that one is holding confidential business information, a contract, tort or fiduciary claim may be pressed without running afoul of the displacement provision of DUTSA.

The Court thus concludes that but for the confidentiality clause in the AMS/DMMS contract, Plaintiff's Count II would be displaced by the Court's ruling on Plaintiff's trade secret claim.

---

[122] It should be noted here that the tortuous interference claim in *ADSI* was dismissed by the Chancery Court because the contract was lawfully terminated, following the decision in *Luscavage v. Dominion Dental, USA, Inc.*, 2007 WL 901641 (Del. Super. Mar. 20, 2007) that a contract must be breached in order for a tortuous interference to lie. That holding was specifically overruled in the *ASDI* opinion on appeal. *ASDI, Inc.*, 11 A.3d at 750.

## D. SURVIVAL OF THE TORTUOUS INTERFERENCE CLAIM IS CONSISTENT WITH THE EXCEPTIONS TO DISPLACEMENT UNDER DUSTSA

Further support for this conclusion may be found in the "exceptions" to the displacement provision. Specifically, section 7 does not preclude "contractual remedies, whether or not based upon misappropriation of a trade secret."[123] The complaint here is that Defendants obtained information from DMMS that DMMS was contractually obligated to keep confidential. The claim is indifferent to whether the information was a trade secret but rather that its disclosure was controlled by contract.

In the Court's view, a party seeking to avoid the downside risk of a court ruling that a given piece of confidential business information is not protectable under the Trade Secrets Act is commended to the liberal use of non-disclosure agreements, employment contracts, non-competition agreements and the like. Because section 7 carves out actions in contract from its preemption provision, an idea can retain its protection in contract – or as here, in tort arising from a contract – regardless whether the information is ultimately held to be a trade secret by a court.

---

[123] 6 *Del. C.* § 2007(b).

The Court believes that Plaintiff's claim of tortuous interference survives section 7 of UTSA, notwithstanding that it is not brought in contract.[124] The goals sought to be achieved by uniformity in sections 7 and 8 of UTSA presuppose the absence of a contract that governs the rights of the parties. As section 7 makes clear, where a contract is present, the contract provides the remedies and delineates the rights and duties. The Court agrees with courts that have held that a contract cannot "create" a trade secret and even calling information a "trade secret" by contract cannot make it so.[125] On the other hand, it cannot be that contracts and other undertakings seeking to protect non-trade secret confidential business information are to be ignored in favor of the uniformity sought by section 7 of UTSA.

The fact that this claim is brought as tortuous interference does not change the analysis. Tortuous interference is simply a secondary means to vindicate contract rights against those not in privity on the contract. It makes no sense to permit actions on the contract and deny them in tort based upon the same contract. Subsection (b)(2) specifically permits civil actions that are *not* based upon trade

---

[124] Tortuous interference has been found elsewhere to withstand the displacement analysis of section 7. *See e.g., Hauck Manufacturing v. Astec Industries, Inc.,* 375 F. Supp. 2d 649, 659 (E.D. Tenn. 2004); *Mattel, Inc. v. MGA Ent., Inc.,* 782 F.Supp. 2d 911, 993-94 (C.D. Cal. 2011); Cross, *supra* note 106, at 465 (a "significant majority" of courts find no preemption in claims of tortuous interference with contract).

[125] *See, e.g., Sun Media Systems, Inc. v. KSDM, LLC,* 564 F. Supp. 2d 946, 965 (S.D. Iowa 2008).

secrets. The Court must conclude that Plaintiff's tortuous interference claim is not preempted by section 7 of DUTSA.

## V. TORTUOUS INTERFERENCE CLAIMS

Defendant Michele Camponelli was the "CEO" of DMMS, the bookkeeping company during the relevant time. Defendant Thomas Spahr was the "practice manager" at GA beginning in March 2013. They each move for summary judgment as individuals (hereinafter "Individual Defendants").

The tortuous interference claims that persist in this Amended Complaint require the following proof: 1) a contract 2) about which defendant knew[126] and 3) an intentional act that is a significant factor in causing the breach of such contract 4) without justification 5) which causes injury.[127]

In this case, the record shows that Individual Defendant Michelle Camponelli joined DMMS in 2011 and was named its CEO in November 2012. At some point that she was unable to identify any more precisely, Camponelli was told by the director/physicians at DMMS that Katz would be joining the GA

---

[126] Tortuous interference is an intentional tort. The requirement that the contract be one "about which the defendant knew" is not satisfied by constructive or imputed knowledge. There must be proof that the defendant knew about the specific clause in the contract with which it is alleged he interfered. *See Anesthesia Services, P.A. v. Anesthesia Advantage, P.C.*, 2013 WL 3352672 (Del. Super. June 27, 2013)(defendant not liable for interference with contract provision regarding geographic restriction in employment agreement absent proof of knowledge of the provision).

[127] *Ethypharm S.A. France v. Bentley Pharm., Inc.*, 388 F. Supp. 2d 426, 434–35 (D. Del. 2005)(citing *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1284 (Del. Super. 2001).

payroll and the contract with AMS would be terminated. While she was aware of a contract between AMS and DMMS, it meant little or nothing to her once she was so advised, because Katz was a willing participant in any information sharing, as it was necessary to the transition from AMS to GA. There is nothing in this record supporting the proposition that Camponelli stood to gain personally from a breach of the confidentiality provision.

As to Defendant Spahr, he joined GA in March 2013. By that time, bringing Katz in to GA had been decided months earlier. Indeed, by the time Spahr arrived, there was nothing in the works that would have given him any reason to believe anything he did was wrong, improper, or in breach of any contract.

The Restatement directs us to consider whether an "interference" is "improper" by considering:

> (a) the nature of the actor's conduct;
> (b) the actor's motive;
> (c) the interests of the other with which the actor's conduct interferes;
> (d) the interests sought to be advanced by the actor;
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other;
> (f) the proximity or remoteness of the actor's conduct to the interference; and
> (g) the relations between the parties.[128]

---

[128] Restatement (Second) of Torts § 767 (1979).

When we consider these two Defendants in the context of these considerations, Plaintiff cannot demonstrate to any rational fact finder that the Individual Defendants' conduct was tortuous. Camponelli acknowledged an awareness of the AMS/DMMS contract at her deposition. As to the confidentiality provision, Camponelli testified:

A:    I have read it.

Q:    Okay, and when did you read it?

A:    I don't recall.

Q:    For what purpose did you read it?

A:    I don't recall.

Q:    What is your understanding of the provision?

A:    Confidentiality of records.[129]

While this awareness of a confidentiality provision might put Camponelli on the wrong side of the impropriety analysis, it must be tempered by her testimony, repeated several times, that she understood that Katz had agreed to sign an employment agreement with GA and any confidentiality provision with respect to AMS was effectively abrogated in light of his agreement.

Q:    Yes, okay. Would you agree that once GA began providing anesthesia services, it became a competitor of AMS?

---

[129] Pl. Ex. 65, at 73.

45

A:   No, I did not view it as that. Again, as I mentioned before, in my mind, it was a collaboration[130] . . . But I knew they were working on it as a team, together, that Dr. Katz was working with the other physicians to come on board.[131]

Q:   So at that point, with that understanding, you thought there was no confidentiality that needed to be observed between those two companies?

A.   I thought that they had an arrangement that it was okay to share.[132]

This was not an unreasonable conclusion, particularly in light of the fact that Katz was (or at least became) a willing participant in the exchange of AMS' confidential business information as GA began making "par" arrangements with various insurance companies.

As to Defendant Spahr, there is even less evidence that he acted with a tortuous intent. Spahr testified when he arrived at GA in March 2013:

It had already been done. In fact, when I joined GA one of my first major projects assigned was to implement the anesthesia group, integrate them into GA. That is what I was told. The agreements were done, the decision was made. Implement it pretty much. So, I didn't get involved in any of that.[133]

As to the specific question whether Spahr knew about any financial confidentiality with respect to the AMS/DMMS agreement, Spahr testified, "No,

---

[130] *Id.* at 77.

[131] *Id.*

[132] Pl. Ex. 65, at 78. *See also* Pl. Ex. 65, at 81, 96, 116.

[133] Pl. Ex. 69, at 21.

I'm sorry, I didn't see the agreement. I know there was an agreement. That was not part of GA's responsibility other than there was an agreement and they were to do our billing and I knew the parameters of what they were going to charge us for billing." Spahr never saw the AMS/DMMS agreement.[134]

It is abundantly clear from the record that Camponelli and Spahr were each following directions from the Defendant physicians and neither were motivated by anything more than a desire to please their superiors. While Katz surely did have an interest in enforcing the confidentiality of the AMS agreement with DMMS, he did precious little to police it even as he secured a generous employment agreement with GA. Employees Camponelli and Spahr, on the other hand, had an understandable interest in remaining employed by doing as directed by their bosses. While the termination of the AMS/ECD contract is complained of as the final act in a chain of events perpetrated by the defendants, it is at best theoretical that these employees were turning the gears in that enterprise. These were the firemen, stoking the engine; they had little reason to know, or care, where the train was headed. As to the relationship between the parties, neither Spahr nor Camponelli expressed any animus or ill will toward Katz, indeed, they both thought they were complying with the wishes of all concerned by helping to

---

[134] Pl. Ex. 69, at 24.

47

integrate AMS and Katz with GA and completed the transition with some pride they had done so successfully.

Because the Court concludes that the conduct of these two Individual Defendants was not "improper" under Restatement §767, it necessarily follows that they are entitled to summary judgment.

In light of the foregoing analysis, summary judgment is Granted in Part, Denied in Part as to defendant GA and granted as to Individual Defendants Camponelli and Spahr.

_____
Judge Charles E. Butler

48